1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| XIAO LUO HUANG,<br><br>                    Petitioner,<br><br>v.<br><br>SERGIO ALBARRAN, ET AL.,<br><br>                    Respondents. | Case No. 1:25-CV-01308 JLT EPG<br><br>ORDER DENYING REQUEST FOR TEMPORARY RESTRAINING ORDER AND REFERRING MATTER TO ASSIGNED MAGISTRATE JUDGE<br><br>(Doc. 2) |

**I.      INTRODUCTION**

Before the Court for decision is Xiau Luo Huang's request for a temporary restraining order (Doc. 2) filed in conjunction with his petition for a writ of habeas corpus brought under 28 U.S.C. § 2241 challenging his ongoing immigration detention. (Doc. 1.) Having evaluated the TRO request, Respondents' opposition (Doc. 9)), and Mr. Huang's reply (Doc. 10) in light of the entire record, the Court **DENIES** the requested TRO and REFERS the matter to the assigned magistrate judge for a determination on the merits.

**II.      FACTUAL & PROCEDURAL BACKGROUND**

Petitioner is a citizen of the People's Republic of China who entered the United States as a lawful permanent resident in 1983 at the age of 16. (Doc. 1, ¶ 4; Doc. 9-1, ¶ 6.) In 2005, because he had sustained several convictions, including for an aggravated felony, Petitioner was ordered to be removed to China. (Doc. 9-1, ¶ 12; *see also* Doc. 9-2 at 16 (indicating that withholding and relief under the Convention Against Torture requests were denied).) He pursued various appeals,

1   but the removal order appears to have become final in 2009. (Doc. 9-1, ¶ 12.)

2          On May 18, 2011, he was arrested by Immigration and Customs Enforcement based upon

3   the 2005 final order of removal. (Doc. 9-1, ¶ 13.) He was released from custody on an Order of

4   Supervision (OSUP) on August 18, 2011, because DHS had not effected his removal during the

5   prescribed period. (*Id*.) In 2012, Petitioner filed a Motion to Reopen with the Board of

6   Immigration Appeals, which eventually reopened and remanded Petitioner's case. (*Id*., 14.)

7          On June 6, 2016, Petitioner sustained another conviction under California Health & Safety

8   Code § 11358 for planting/cultivating marijuana, for which he was sentenced to 270 days in jail

9   and 60 months of probation. (Doc. 9-1, ¶ 15.) On January 17, 2017, ICE detained petitioner again

10  following his release from jail. (*Id*., ¶ 16.) On August 23, 2017, an IJ again ordered that Petitioner

11  be removed to China. (*Id*., ¶ 17.) Shortly thereafter, on September 7, 2017, an IJ denied

12  Petitioner's request for bond after DHS argued he was a flight risk and a danger to the

13  community. (*Id*., ¶ 18.) However, on April 3, 2018, Petitioner was once again released on an

14  OSUP because DHS had not effected his removal during the prescribed period. (*Id*., ¶ 19.) Since

15  being placed on OSUP, Mr. Huang reconnected with his family—including his U.S. citizen

16  daughter and granddaughter—while working and supporting himself and his family. (Doc. 1,

17  ¶ 38.)

18         On September 19, 2025, ICE detained Petitioner and revoked the OSUP. (Doc. 9-1, ¶ 20.)

19  Petitioner was served with a Notice of Revocation of Release that indicates there have been

20  changed circumstances in his case because there is now "a significant likelihood of removal in the

21  reasonably foreseeable future in your case." (Doc. 9-2 at 21.) On October 8, 2025, ICE submitted

22  a request to the Chinese government for a travel document for Petitioner. (Doc. 1, ¶ 23.)

23  According to the Declaration of Deportation Officer Paul Villagran, "[t]he Chinese government

24  has recently been fulfilling travel document requests within forty-five to sixty days, but

25  sometimes less." (*Id*.)

26         On October 10, 2025, three weeks after he was re-detained, an ICE Officer conducted an

27  informal interview pursuant to 8 C.F.R. § 241.4(l) and 8 C.F.R. § 241.13(i). (Doc. 9-2 at 41.)

28  According to a document produced at that interview, Petitioner was offered "an opportunity to

1    respond to the reasons for revocation of his or her order of supervision stated in the notification

2    letter." (*Id.*) Apparently, Petitioner "decided not to make a statement" to the officer. (*Id.*)

3           On October 3, 2025, Mr. Huang filed a petition for a writ of habeas corpus pursuant to 28

4    U.S.C. § 2241, alleging that (1) his re-detention was arbitrary and capricious in violation of the

5    Administrative Procedure Act because Respondents have the authority to revoke release only if

6    circumstances have changed and there have been no changed circumstances (Doc. 1, ¶¶ 82–85);

7    (2) his detention failed to comply with the procedural and substantive requirements of 8 C.F.R.

8    § 241.13 because, among other things, Respondents failed to make an individualized

9    determination of whether his removal is reasonably foreseeable and/or whether he is a danger or a

10   flight risk (*id.*, ¶¶ 86–94); (3) his due process rights have been violated because he was detained

11   without a pre-deprivation hearing and because his ongoing detention is "unconstitutionally

12   indefinite" because he cannot be removed to China in violation of *Zadvydas v. Davis*, 533 U.S.

13   678, 701 (2001) (*id.*, ¶¶ 95–110); and (4) that his removal to "any third country without adequate

14   notice and an opportunity to apply for relief under the Convention Against Torture would violate

15   his due process rights." (*Id.*, ¶¶ 111–15.) On the same day, Petitioner also filed a motion for a

16   temporary restraining order in which Petitioner requests immediate release from custody; an

17   injunction against re-detention without a pre-deprivation hearing before a neutral arbitrator at

18   which DHS bears the burden of demonstrating, by clear and convincing evidence that

19   circumstances have materially changed; and an injunction against third country removal without

20   certain procedural protections. (Doc. 2-3.)

21          On October 8, 2025, the Court issued a Minute Order calling for the filing of an

22   opposition and reply related to the request for injunctive relief. (Doc. 8.) In addition, the Court

23   temporarily precluded Respondents from removing Petitioner from the United States, unless the

24   Court orders otherwise, while this case is pending. Having considered the entire record, the Court

25   **DENIES** the request for preliminary injunctive relief and refers the matter to the assigned

26   magistrate judge.

27   **III.    ANALYSIS**

28          The standard for issuing a TRO is the same as the standard for issuing a preliminary

3

1    injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir.

2    2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

3    "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

4    "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

5    the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

6    "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

7    (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

8    test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

9    1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

10    *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

11    Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

12    at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

13    the issuance of a preliminary injunction where there are "serious questions on the merits … so

14    long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

15    injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

16    never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to

17    "merely to preserve the relative positions of the parties until a trial on the merits can be held, and

18    to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S.

19    Ct. 659, 667 (2025) (citations omitted).

20        The status quo refers to "the last uncontested status which preceded the pending

21    controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

22    *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

23    Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

24    CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining

25    order requiring immediate release of the petitioner back to home confinement from custody, as a

26    restoration of the status quo).

27        **A.    Likelihood of Success on the Merits**

28        This first factor "is the most important" under *Winter*, and "is especially important when a

4

1    plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

2    Cir. 2023). Petitioner contends that his re-arrest and continued detention violates due process and

3    applicable regulations. (*See generally* Doc. 2 at 14–30.)

a.    *Zadvydas' Reasonable Foreseeability of Removal*

5    Petitioner contends that his detention is unlawful in violation of *Zadvydas* because his

6    removal is not reasonably foreseeable. (Doc. 2 at 14–15.) Under the INA, when an individual is

7    subject to a final order of removal, the government ordinarily must secure removal of that

8    individual from the United States within a period of 90 days, known as the "removal period." 8

9    U.S.C. § 1231(a)(1)(A). The removal period begins on the latest of the following dates: (i) "[t]he

10    date the order of removal becomes administratively final;" (ii) "[i]f the removal order is judicially

11    reviewed and if a court orders a stay of the removal of the [noncitizen], the date of the court's

12    final order;" or (iii) "[i]f the [noncitizen] is detained or confined (except under an immigration

13    process), the date the [noncitizen] is released from detention or confinement." 8 U.S.C. § 1231

14    (a)(1)(B)(i)-(iii). There is no suggestion in this record that Petitioner's removal order became

15    administratively final within the last 90 days under any of these provisions, so the Court

16    concludes it "became final long ago." *See Alva v. Kaiser*, No. 25-CV-06676-RFL, 2025 WL

17    2419262, at *3 (N.D. Cal. Aug. 21, 2025) (concluding removal period began when removal order

18    was reinstated).

19    In general, during the 90-day removal period, the Attorney General "shall detain the

20    alien." 8 U.S.C. § 1231(a)(2)(A). The INA authorizes further detention beyond the removal

21    period under certain circumstances, "including, *inter alia*, those who are removable under 8

22    U.S.C. § 1227(a)(2) for certain criminal offenses, those determined to be a risk to the community,

23    or those unlikely to comply with the order of removal." *Vaskanyan v. Janecka*, No. 5:25-CV-

24    01475-MRA-AS, 2025 WL 2014208, at *3 (C.D. Cal. June 25, 2025) (citing 8 U.S.C.

25    § 1231(a)(6)).

26    The Supreme Court set the "presumptively reasonable period of detention" under 8 U.S.C.

27    § 1231(a)(6) at six months. *Zadvydas*, 533 U.S. at 701. After the detention has surpassed the

28    "presumptively reasonable" 6-month period, and "once the alien provides good reason to believe

1   that there is no significant likelihood of removal in the reasonably foreseeable future, the

2   Government must respond with evidence sufficient to rebut that showing." *Id*. Additionally, "as

3   the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable

4   future' conversely would have to shrink" for detention to remain reasonable. *Id*.

5        However, the "6-month presumption does not mean that every alien not removed must be

6   released after six months. To the contrary, an alien may be held in confinement until it has been

7   determined that there is no significant likelihood of removal in the reasonably foreseeable future."

8   *Id*. Nor must an alien show that their removal is entirely impossible to receive habeas relief, only

9   that there is no reasonable likelihood of their removal in the foreseeable future. *Id*. at 702. In the

10  Ninth Circuit, "no significant likelihood of removal in the reasonably foreseeable future" means

11  that "the alien must show that he would be unremovable even if the government defeated his

12  petition for review." *Diouf v. Mukasey*, 542 F.3d 1222, 1233 (9th Cir. 2008). In other words, he

13  must be stuck in a "removable-but-unremovable limbo." *Prieto-Romero v. Clark*, 534 F.3d 1053,

14  1063 (9th Cir. 2008).

15       As a threshold matter, Petitioner suggests his *Zadvydas* claim is ripe because, though he

16  has been detained on this occasion since September 19, 2025 (i.e., only approximately one

17  month), the record indicates Petitioner has been detained by immigration authorities in the past

18  for approximately a year. (*See* Doc. 2 at 19; Doc. 9-1, ¶ 13 (describing detention from May 18,

19  2011, through August 18, 2011); *id*., ¶ 16 (describing detention from January 17, 2017, through

20  September 7, 2017).) There is some authority indicating that detentions should be measured

21  cumulatively for purposes of *Zadvydas*. *See S.F. v. Bostock*, No. 3:25-CV-01084-MTK, 2025 WL

22  2841022, at *4 (D. Or. Oct. 7, 2025) ("[F]ederal courts have refrained from applying the

23  presumption of reasonableness under *Zadvydas* in re-detention cases" even where the second

24  detention is less than six months.); *Phong Thanh Nguyen v. Scott*, No. 25-cv-01389, 2025 WL

25  2419288, at *13 (W.D. Wash. Aug. 21, 2025) ("[T]he six-month period does not reset when the

26  government detains a[ ] [noncitizen] ..., releases him from detention, and then re-detains him

27  again.") (citation omitted).

28       Assuming, *arguendo*, that Petitioner's *Zadvydas* claim is ripe, for the reasons articulated

1   below, the Court does not find that he has provided "good reason to believe that there is no

2   significant likelihood of removal in the reasonably foreseeable future" as is his burden.

3                        b.    *Regulations Applicable to Revocation*

4         Petitioner argues his detention is unlawful, and potentially a violation of due process,

5   because ICE violated regulations pertaining to the revocation of his OSUP. It is undisputed that

6   Petitioner is subject to an order of removal that became final many years ago. When, as here, a

7   noncitizen does not leave or is not removed within the 90-day removal period, the individual,

8   "pending removal, shall be subject to supervision." 8 U.S.C. § 1231(a)(3). "As mandated by

9   Congress, the default status after the 90-day removal period is therefore release on conditions, not

10  detention." *Alva*, 2025 WL 2419262, at *3. Noncitizens subject to a removal order may be

11  released pursuant to 8 C.F.R. § 241.4 or 8 C.F.R. § 241.13. *See Ceesay v. Kurzdorfer*, 781 F.

12  Supp. 3d 137, 154 (W.D.N.Y. 2025). Once released, those same regulations also govern

13  revocation of release.

14        Here, the revocation of Petitioner's OSUP is controlled by 8 C.F.R. § 241.13,[1] which

15  provides "special review procedures for those aliens who are subject to a final order of removal

16  and are detained under the custody review procedures provided at [8 C.F.R. § 241.4] after the

17  expiration of the removal period, where the alien has provided good reason to believe there is no

18  significant likelihood of removal to the country to which he or she was ordered removed, or to a

19  third country, in the reasonably foreseeable future." *Id.*, § 241.13(a). If DHS determines there is

20  no significant likelihood of removal, DHS must "promptly make arrangements for the release of

21  the alien subject to appropriate conditions" unless "there are special circumstances justifying

22  continued detention." *Id.*, § 241.13(g)(1). However, if DHS "subsequently determines, because of

23  a change of circumstances, that there is a significant likelihood that the alien may be removed in

24  the reasonably foreseeable future to the country to which the alien was ordered removed or to a

25  third country, the alien shall again be subject to the custody review procedures under 8 C.F.R.

26  241.4." 8 C.F.R. § 241.4(b)(4).

27

28  ---
[1] There is no suggestion on the present record that Petitioner violated the terms of his supervision; rather he was given notice that he was being detained because of "changed circumstances regarding the reasonable foreseeability of removal." (*See* Doc. 9-2 at 21.)

If § 241.4 is triggered, it sets forth the procedures for revocation of supervision:

> (1) Violation of conditions of release. Any alien described in paragraph (a) or (b)(1) of this section who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody. Any such alien who violates the conditions of an order of supervision is subject to the penalties described in section 243(b) of the Act. **Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.**
>
> (2) Determination by the Service. **The Executive Associate Commissioner shall have authority, in the exercise of discretion, to revoke release and return to Service custody an alien previously approved for release under the procedures in this section.** A district director may also revoke release of an alien when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner. **Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:**
>
>> (i) The purposes of release have been served;
>>
>> (ii) The alien violates any condition of release;
>>
>> (iii) **It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or**
>>
>> (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(l)(emphasis added)).[2]

The record indicates that Petitioner was provided with written notice at the time of his re-detention on September 19, 2025. (*See id*.) He was also provided with an informal interview though not for 21 days, on October 10, 2025. (*Id*. at 41.) At that interview, ICE documented that

---

[2] Though DHS has asserted in other litigation that the notice requirements set forth in 8 C.F.R. § 241.4(l)(1) do not constrain revocation of release pursuant to § 241.4(l)(2), several district courts have rejected that argument. *See, e.g.*, *Ceesay*, 781 F. Supp. 3d at 163–4 & n. 25 (finding this argument "does not make sense" because paragraph (l)(2)(ii) includes violations of supervised release "as one of the possible reasons for revoking release" and requiring procedures of notice and an interview "regardless of the reason for the revocation"); *Zhu v. Genalo*, No. 1:25-CV-06523 (JLR), 2025 WL 2452352, at *6–7 (S.D.N.Y. Aug. 26, 2025) (finding such an interpretation would " result in imbalanced procedural safeguards for noncitizens redetained under section 241.4" because "noncitizens who are redetained because they violated the terms of supervision" would be entitled to more process than those who have met their obligations to report). The Court agrees with those decisions that the notice and interview requirements apply to anyone whose supervision has been revoked pursuant to 8 C.F.R. § 241.4(l)(1) or (2).

Petitioner declined to make any statement. (*Id*.)

The Court has been unable to identify a case involving substantially similar circumstances. In *M.S.L. v. Bostock*, No. 6:25-CV-01204-AA, 2025 WL 2430267 (D. Or. Aug. 21, 2025), for example, ICE's failure to follow § 241.13 rendered a detention unlawful where, within two days of being detained, the petitioner was given generic notice that her OSUP was being revoked because a determination had been made that there was a significant likelihood of removal in the reasonably foreseeable future. *Id*. at *4. However, approximately a month later, she was issued a new notice providing an entirely different—and still generic—basis for revocation as follows

> You are advised that ICE has determined that you have violated conditions of your release that were listed in the Order of Supervision you were issued at the time of your release from ICE custody, to wit, you failed to report in at a time and place as required and failed to timely notify and obtain advance permission of ICE prior to your relocation to Oregon from California.

*Id*. at *5. The same evening the second notice was issued, petitioner participated in an informal interview, at which she offered a substantive defense, namely that she was relying on the advice of counsel (or at least someone she thought was a lawyer) in deciding to relocation to Oregon. *Id*. at *5. *M.S.L.* concluded that "ICE's failure to provide Petitioner with a timely Notice of Revocation or conduct an informal interview until nearly a month after taking her into custody is a grave violation of Petitioner's due process rights in that they deprived her both of meaningful notice and an opportunity to be heard" in part because ICE failed to provide timely notice of revocation and a "prompt" informal interview so that she could contest the reasons for her revocation. *Id*. at *11–*12.

In *Perez-Escobar v. Moniz*, No. 25-CV-11781-PBS, 2025 WL 2084102, at *2 (D. Mass. July 24, 2025), the petitioner received a Notice of Revocation of Release, stating generically that officials had reviewed his "official alien file" and determined "there are changed circumstances in your case," including that "there is a significant likelihood of removal in the reasonably foreseeable future" and that DHS "determined the purpose of your release has been served and it is appropriate to enforce the removal order." *Id*. at *1. That notice was deemed insufficient for

1    purposes of the regulation and due process. *Id*. at *2. In particular, Perez had not yet had a

2    reasonable fear interview regarding his asserted fear of being sent to the country to which he was

3    ordered removed. *Id*. at *1. For that reason, the court found that the absence of a more detailed

4    explanation for the reason for his detention was "especially concerning," because he had a

5    statutory right not to be removed to the target country if he showed entitlement to withholding of

6    removal. *Id*. at *2. In this context, "ICE's conclusory explanation for revoking [Perez's] release

7    did not offer him adequate notice of the basis for the revocation decision such that he could

8    meaningfully respond at the post-detention 'informal interview.'" *Id*. at *3.

9        Finally, *Zhu v. Genalo*, No. 1:25-CV-06523 (JLR), 2025 WL 2452352, at *1 (S.D.N.Y.

10    Aug. 26, 2025), concerned a Chinese national who was detained in 2018 but released because of

11    China's unwillingness to accept deportees. His supervision was cancelled without any notice or

12    explanation in August 2025, and he was not given a post-deprivation interview. *Id*. Even though

13    the government represented to the court in its briefing that "since January 2025, China has

14    accepted citizens who were removed from the United States and that ICE [was] currently working

15    to obtain travel documents to effectuate [Zhu's] removal to China," *id*. at *2, Zhu was ordered

16    released because he "received no process before being redetained, in violation of ICE's own

17    regulations and the Due Process Clause." *Id*. at *9. Nor did he receive any of the procedural

18    protections required by § 241.(l)(1) because the government maintained in that case that he was

19    not entitled to those protections. *Id*. at *5.

20        In contrast, *Douglas v. Baker*, No. 25-CV-2243-ABA, 2025 WL 2687354 (D. Md. Sept.

21    19, 2025), stopped short of ordering immediate release for a detainee where the foreseeability of

22    removal was unclear but at least appeared to be possible and supported by evidence. There,

23    Douglas, a citizen of Jamaica who had been living in the United States for several decades, was

24    subject to a final order of removal to Jamaica that was withheld pursuant to the Convention

25    Against Torture. *Id*. at *1. He was released on OSUP and complied with all conditions of release.

26    *Id*. In July 2025, he appeared for an appointment but was re-detained by ICE. *Id*. At that time, he

27    was provided a Notice of Revocation of Release that indicated that his "case is under current

28    review by [the] United Kingdom for the issuance of a travel document," as well as a "Notice of

1  Removal" that also warned him of removal to the United Kingdom. *Id*. at *1–2. In the context of

2  his *Zadvydas* claim, Douglas argued that "removal to the U.K. is unlikely both because the U.K.

3  is unlikely to authorize the U.S. to send him there and because the U.K. is unlikely to commit to

4  not repatriating him to Jamaica." *Id*. at *3. But, though recognizing there was "substantial

5  uncertainty" about his removal, the government responded with evidence the *Douglas* court found

6  sufficient to rebut that showing. *Id.* As to Douglas' claim that his detention violated 8 C.F.R. §§

7  241.4(l) and/or 241.13, the court concluded that Douglas had not shown that any such violations

8  would "independently entitle" him to release from detention because the government revoked his

9  supervised released based upon a determination that it is appropriate to enforce a removal order

10  within the meaning of 8 C.F.R § 241.4(l)(2)(iii). *Id*. at *5. However, Douglas was entitled to

11  additional process because the government failed to conduct the informal interview required by 8

12  C.F.R. § 241.13(i)(3). As *Douglas* explained:

13  [Section] 241.4(g)(4) operates in parallel with § 241.4(l). [U]nder §
14  241.4(g)(4), a "custody review" need not be conducted if "it is *ready to execute* an order of removal." 8 C.F.R. § 241.4(g)(4) (emphasis added). The "informal interview" required by § 241.4(l)
15  is different. That procedure ensures that when a noncitizen's release has been revoked, the noncitizen has notice and an opportunity to
16  be heard regarding the basis for the revocation of release.

17  *Id*. at *6. Nothing in the *Douglas* record excused ICE from conducting the informal interview

18  when it revoked his conditions of supervised release, so the court ordered the interview to take

19  place. *Id.*

20      Considering these authorities, the Court is not convinced that the injunctive remedy

21  requested here—immediate release—is justified on the present record. DHS asserts that Mr.

22  Huang's removal is likely to be secured in the coming weeks and has applied for travel

23  documents. Though the notice provided to Mr. Huang was generic, it indicated that DHS believed

24  at that time that his removal was forthcoming. The initial notice was not wholly erroneous as was

25  the case in *M.S.L.* Moreover, there are no other circumstances that render this summary-type

26  notice problematic. This case is not like *Perez*, where the petitioner had not yet received his

27  credible fear interview so it remained entirely unclear whether he could be removed at all to the

28  target country. In contrast, Mr. Huang's requests for withholding of removal and CAT protection

11

1   have already been denied, at least as those issues were presented in 2005. (*See* Doc. 9-2 at 16

2   (indicating that withholding and relief under the Convention Against Torture requests were

3   denied on 11/30/2005).) To be sure, additional details might have been helpful, but the notice was

4   not so devoid of content as to be meaningless under the circumstances.

5       In addition, ICE has afforded Petitioner an informal interview. Though it was conducted

6   three weeks after his initial detention (and approximately a week after he filed this habeas case),

7   he refused to participate. This record makes it difficult for the Court to find that Petitioner's

8   situation was prejudiced by delayed provision of that interview. *Cf Lata v. INS*, 204 F.3d 1241,

9   1246 (9th Cir. 2000) ("To prevail on a due process challenge to deportation proceedings,

10  [petitioner] must show error and substantial prejudice. A showing of prejudice is essentially a

11  demonstration that the alleged violation affected the outcome of the proceedings[.]" (citations

12  omitted)); *Reyes-Lorenzo v. Gonzales*, 140 F. App'x 735, 736 (9th Cir. 2005) ("A violation of a

13  regulation invalidates a deportation proceeding when the "regulation serves a purpose of benefit

14  to the alien" and the "violation prejudiced interests of the alien which were protected by the

15  regulation.")).

16      Finally, though Petitioner has offered evidence to suggest his removal to China is *not*

17  reasonably foreseeable, much of that information is dated. (*See, e.g*., Doc. 1, ¶ 2 &  n. 1 (citing

18  media reports from 2020, 2022, and 2004).) Respondents dispute these assertions, though their

19  evidence is also quite generic. (*See, e.g*., Doc. 9-1, ¶ 23 ("On October 8, 2025, ICE submitted a

20  travel document for Petitioner. ICE requested that the Chinese government issue Petitioner a

21  passport or other suitable travel document within seven days. The Chinese government has

22  recently been fulfilling travel document requests within forty-five to sixty days, but sometimes

23  less.).) ICE has not, for example, pointed to specific information suggesting rates of travel

24  document issuance from China in recent weeks or months, whether and at what rates any such

25  documents have been issued to Chinese nationals with criminal records, and/or how quickly those

26  documents were produced.

27      All this leads the Court to conclude that Petitioner has not <u>yet</u> met his burden under

28  *Zadvydas* or demonstrated a due process violation regarding the applicable regulations sufficient

1    to warrant his immediate release. This is without prejudice to further development of the issues in

2    merits briefing.

3    **IV.    CONCLUSION AND ORDER**

4        For the reasons set forth above, the request for preliminary injunctive relief is **DENIED**

5    and the matter is referred to the assigned magistrate judge. The minute order, dated October 8,

6    2025, precluding Respondents from removing Petitioner from the United States, is

7    **WITHDRAWN**.

8

9    IT IS SO ORDERED.

10       Dated:    **October 22, 2025**

                                        UNITED STATES DISTRICT JUDGE