# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

XIAO LUO HUANG,

               Petitioner,

v.

ALBARRAN, ET AL.,

               Respondents.

Case No. 1:25-cv-01308 JLT EPG

AMENDED ORDER GRANTING MOTION FOR RECONSIDERATION OF ORDER DENYING REQUEST FOR PRELIMINARY INJUNCTION[1]

(Doc. 14)

Before the Court is Xiau Luo Huang's request for reconsideration, (Doc. 14), of this Court's Order issued October 23, 2025, (Doc. 11), denying his earlier motion for a temporary restraining order ("TRO"), (Doc. 2), which was filed alongside his petition for writ of habeas corpus, (Doc. 1). The Court has reviewed all the papers and attachments related to the motion for reconsideration. (Docs. 14, 16, 19, 22, 23-2, 23-3.) The Petitioner has highlighted district court authorities, (*see* Doc. 14 at 14), that persuade the Court to reconsider its framing of the applicable legal standard. Applying the appropriate legal standard and considering Respondent's response to the Court's order to show cause, (Doc. 20 at 5–6; Doc. 22), this Court **GRANTS** Petitioner's Motion for Reconsideration (Doc. 14) and **ORDERS** Petitioner's immediate release from custody. The Court **REFERS** the matter to the assigned magistrate judge for a determination on

---

[1] The original motion sought a TRO and preliminary injunction. Thus, the parties briefed both issues. Consequently, the Court converts the matter to a request for preliminary injunction.

1

the merits.

## I.   BACKGROUND

### A.  Procedural History

On October 3, 2025, Petitioner filed a petition for writ of habeas corpus, (Doc. 1), and a motion for temporary restraining order, (Doc. 2).  In relevant part, the TRO argues that Petitioner's re-detention is unlawful because it violates the Fifth Amendment due process clause and 8 C.F.R. § 241.13(i)(2)–(3).  (*See* Doc. 2 at 16–26.)  This Court denied the TRO and Petitioner's request for immediate release.  (Doc. 11.)  On November 11, 2025, Petitioner filed a Motion for Reconsideration, (Doc. 14).  Respondents filed an opposition to that motion on November 25, 2025, (Doc. 16), and Petitioner filed a reply on December 5, 2025, (Doc. 19).

On December 15, 2025, this Court ordered Respondent's to show cause why Petitioner is not entitled to immediate release under *Yan-Ling X. v. Lyons*, No. 1:25-cv-01412-KES-CDB, 2025 WL 3123793, at *3–4 (E.D. Cal. Nov. 7, 2025) and cases cited therein.[2]  (Doc. 20 at 2–5.) Specifically, this Court ordered Respondents to show a material change in circumstance indicating a significant likelihood of removal in the reasonably foreseeable future to justify Petitioner's re-detention, as required under 8 C.F.R. § 241.13(i)(2).  (*Id*. at 3, 5.)

On December 19, 2025, Respondent's filed a response to the order to show cause where they argue, amongst other things, that Petitioner's removal is foreseeable because ICE is taking active steps to obtain travel documents for Petitioner.  (Doc. 22.)  On December 22, 2025, Petitioner filed a motion for leave to submit a reply and attached a copy of his proposed reply. (Doc. 23.)  On December 23, 2025, this Court granted Petitioner's request for leave.  (Doc. 24.) The matter is now ripe for decision.

### B.  Immigration and Detention History

Petitioner is a native and citizen of China.  (Doc. 14 at 8.)  He first entered the United States as a lawful permanent resident in 1983.  (Doc. 9-1 at 2–3.)  From 1993 until 1995, Petitioner obtained several convictions, including two aggravated felonies.  (*Id*. at 3.)  An

---

[2]  *See Nguyen v. Hyde*, 788 F. Supp. 3d 144, 152 (D. Mass. 2025); *Escalante v. Noem*, No. 9:25-cv-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025).

Immigration Judge ordered Petitioner removed to China on November 30, 2005, and his order of removal became final on July 22, 2009.  (*Id*.)

On May 18, 2011, Petitioner was arrested by Immigration and Customs Enforcement to effectuate his 2005 order of removal.  (Doc. 9-1 at 3.)  Approximately three months later, on August 18, 2011, ICE released the Petitioner on an Order of Supervision ("OSUP") due to an inability to deport him during the legally prescribed period.  (*Id*.)  On May 27, 2014, Petitioner's immigration case was reopened by the Board of Immigration Appeals ("BIA").  (*Id*.)  The BIA remanded Petitioner's case to the IJ for a decision on the merits.  (*Id*.)  Following another felony conviction, ICE re-detained the Petitioner on January 21, 2017, and the IJ again ordered Petitioner removed to China on August 23, 2017.  (*Id*. at 4.)  After having been in ICE custody for over a year, DHS released the Petitioner on April 3, 2018, on OSUP because ICE had again failed to deport him "during the period prescribed by law."  (Doc. 9-1 at 4; Doc. 9-2 at 10.)  Approximately seven and a half years later, on September 19, 2025, ICE re-detained the Petitioner and revoked his OSUP.  (Doc. 9-1 at 4.)

Petitioner claims, "there is no indication . . . [he] violated a condition of release" and that prior to his re-detention, he "continued presenting himself . . . for his regular check-in[s]."  (Doc. 2 at 17, 19.)  Petitioner also claims "[t]here is no evidence of any other change relevant to his detention status, removability, or criminal record" to warrant his arrest.  (Doc. 2 at 12.)  Respondents do not contest this, rather only reference changed circumstances as the basis for Petitioner's arrest.  (*See* Doc. 9 at 2; Doc. 16 at 2; Doc. 22 at 3.)  During the seven years while on release, Petitioner reconnected with his friends and family, helped take care of his granddaughter, volunteered for his community, furthered his education, and maintained employment.  (Doc. 2 at 12, 19–20; *see also* Doc. 23-3 at 4–15.)

The day of his arrest on September 19, 2025, DHS served Petitioner with a "Notice of Revocation of Release."  (Doc. 9-2 at 21.)  The notice indicates that Petitioner's release was revoked "on account of changed circumstances" and because "ICE ha[d] determined . . . a significant likelihood of removal" in his case.  (*Id*.)  The notice expressly cites 8 C.F.R. § 241.13 as the basis for the ICE's detention power, which is consistent with the deportation officer's

declaration stating, "ICE continues to hold Petitioner in custody . . . pursuant to its detention authority under 8 C.F.R. § 241.13(i)(2)." (*Id.*; *see also* Doc. 9-1 at 5.)  The notice further indicates Petitioner would receive a "prompt[] . . . informal interview" where he could "respond to the reasons for [] revocation." (Doc. 9-2 at 21.)  Petitioner received his informal interview exactly three weeks later, on October 10, 2025, wherein Petitioner refused to make a statement. (Doc. 9-2 at 41.)

ICE also served Petitioner a "Notice to Alien of File Custody Review" on October 3, 2025, which indicates that if after three months of being in ICE custody, Petitioner has not yet been removed from the United States, then Petitioner would receive a custody review determination on or about December 17, 2025.  (Doc. 9-2 at 24.)  Petitioner claims that his custody review determination actually occurred on December 12, 2025, five days earlier than the noticed date of December 17, 2025.  (Doc. 23-3 at 2.)  Petitioner's counsel asserts that Petitioner did not receive advance notice of the rescheduled date, nor was he given an opportunity to submit documentation despite the initial notice stating otherwise.  (*Id.*; *see also* Doc. 9-2 at 24.)

On December 16, 2025, ICE issued a "Decision to Continue Detention" informing the Petitioner that "upon review of the factors . . . set forth at 8 C.F.R. § 241.4(e), (f), and (g)," Petitioner failed to demonstrate that, if released, he would not pose a flight risk or danger to the community pending his removal from the United States.  (Doc. 22-2 at 7.)  Accordingly, Petitioner remains in ICE custody and has now been in custody for approximately four months.

**C.  Efforts to Obtain Travel Documents**

Approximately three weeks after Petitioner's detention on September 19, 2025, (Doc. 9-1 at 4), ICE submitted Petitioner's travel document request "to the designated point-of-contact" within Enforcement and Removal Operations ("ERO") San Francisco on October 8, 2025.  (Doc. 16-1 at 2.)  ERO San Francisco is "locally responsible for reviewing and approving travel document requests for China." (*Id.* at 3.)  Upon review, on October 31, 2025, ERO San Francisco then forwarded the request to the Removal and International Operations ("RIO") division at the ERO Headquarters for further processing.  (*Id.*)  On November 13, 2025, RIO approved the request and submitted a nationality verification request to the National Immigration

4

Administration in Beijing, China ("CNIA").  (*Id*.)

On December 3, 2025, CNIA notified RIO that "they were unable to verify Petitioner and requested additional supporting information and documentation from RIO."  (Doc. 22-1 at 2.)  In response to CNIA's request, on December 18, 2025, RIO shared an updated travel document packet to the ICE attaché for further processing.  (*Id*. at 3.)  The ICE attaché is tasked with submitting the updated travel documents to CNIA.  (*Id*.)  Respondents fail to indicate when the attaché is expected to forward the supporting documents to CNIA.

According to Respondents, "[o]nce the [C]NIA verifies Petitioner's nationality, [] RIO can and will promptly submit the verified travel document request to the Chinese Embassy in Washington, D.C., who typically issues a travel document within 7-10 days of receiving the verified travel document request."  (Doc. 16-1 at 3.)  ICE also anticipates removing Petitioner to China "approximately two weeks after his travel document is issued."  (Doc. 9 at 5.)  This suggests that after CNIA verifies Petitioner's nationality, it will take at least an additional three weeks to deport Petitioner to China.

## II.      JURISDICTION

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States."  "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Petitioner seeks his immediate release from custody, which he contends violates the Fifth Amendment Due Process Clause under the United States Constitution.  (*See* Doc. 1 at 9; Doc. 2 at 14–26.)  Thus, he properly invokes the Court's habeas jurisdiction.

The INA limits judicial review in many instances.  Though 8 U.S.C § 1252(g) precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there is no removal order at issue here and the central issue is Petitioner's continued detention.  Thus, this Court has the authority to review Respondent's termination of Petitioner's release.  *See Jennings v. Rodriguez*, 583 U.S.

5

281, 294 (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999).

**III.   ANALYSIS**

**A.  Motion for Reconsideration**

Pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding." *Id*.  Rule 60(b) indicates such relief may be granted for several reasons including "mistake," *see* Fed. R. Civ. P. 60(b)(1), which includes a mistake of law by the Court.  *See Kemp v. United States*, 596 U.S. 528, 533–34 (2022).  The Petitioner has highlighted district court authorities, (*see* Doc. 14 at 14), that persuade the Court to reconsider its decision.[3]

On numerous occasions, this Court has found that under 8 C.F.R. § 241.13(i)(2), when ICE revokes the release of a noncitizen who has been ordered removed to effectuate their removal, it is ICE's burden to show a significant likelihood of removal.  *See Hoac v. Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 199377, at *3 (E.D. Cal. July 16, 2025); *Phan v. Beccerra*, No. 2:25-cv-1757-DC-JDP, 2025 WL 1993735, at * 3–4 (E.D. Cal. July 16, 2025); *Yan-Ling X.*, 2025 WL 3123793, at *3–4; *J.L.R.P. v. Wofford*, No. 1:25-cv-01464-KES-SKO, 2025 WL 3190589, at * 3–4 (E.D. Cal. Nov. 14, 2025).  Section 241.13(i)(2) makes clear that the "Service may revoke an alien's [supervised] release under this section and return the alien to custody if, on account of changed circumstances, *the Service determines* that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future."  8 C.F.R. § 241.13(i)(2) (emphasis added); *Yan-Ling X.*, 2025 WL 3123793, at *3 (citing *Escalante*, 2025 WL 2206113, at *3).

---

[3] This Court initially denied the TRO because under *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), it found Petitioner failed to prove that his removal to China was not reasonably foreseeable.  (Doc. 11 at 8–13.)  However, upon review, *Zadvydas* is not applicable to Petitioner's situation because he was detained under 8 C.F.R. §241.13(i)(2).  (Doc. 20 at 2–3.)  As this Court explained, "This case is not about ICE's authority to detain in the first place upon an issuance of a final order of removal as in *Zadvydas. . .* this case is about ICE's authority to *re-detain* petitioner after he was issued a final order of removal, detained, and subsequently released on an order of supervision. This is not your typical first round detainment of an alien awaiting removal.  Petitioner was previously detained, then released on supervised release for several years, and his 90-day removal period expired." (Doc. 20 at 2 (internal citations and quotations omitted).)

6

There is no question that Section 241.13(i)(2) applies here. Petitioner's "Notice of Revocation of Release" expressly states his release was revoked "on account of changed circumstances" and because "ICE has determined . . . a significant likelihood of removal in the reasonably foreseeable future." (Doc. 9-2 at 21.) Respondents further acknowledge this by attaching a declaration of the assigned deportation officer which states, "ICE continues to hold Petitioner in custody . . . pursuant to its detention authority under 8 C.F.R. § 241.13(i)(2)." (Doc. 9-1 at 5.) Accordingly, using this legal framework, the Court assesses the motion for injunctive relief.

### B.  Injunctive Relief

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction ("PI"). *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is "substantially identical"). When seeking a TRO or PI, the plaintiff must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023).

The Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*, at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury, and that the injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Preliminary injunctions are intended to "merely [] preserve the relative positions of the parties until a trial on the merits can be held,

and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

The status quo refers to "the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958)). In the Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining order requiring immediate release of the petitioner back to home confinement from custody, as a restoration of the status quo).

1.       Likelihood of Success on the Merits

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). Petitioner argues he is likely to succeed on the merits of his due process claim because DHS's actions—namely, the revocation of his supervised release—failed to comply with applicable regulations and violated his due process right to a pre-deprivation hearing. (*See* Doc. 2 at 16–26; Doc. 14 at 13–27; Doc. 23-2 at 2–4.) Petitioner has shown he is likely to succeed on the merits of his due process claim.

a.       *Respondent's Failure to Show Significant Likelihood of Removal Under 8 C.F.R. § 241.13(i)(2) Constitutes a Due Process Violation.*

A non-citizen subject to a final order of removal who is released on OSUP may be re-detained "if, on account of changed circumstances, the Service determines [] there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). "The phrase 'significant likelihood' requires something more than a mere possibility that removal will occur. Evidence that 'there is at least some possibility that' the designated country of removal 'will accept Petitioner at some point . . . is not the same as a significant likelihood that [he] will be accepted in the reasonably foreseeable future.'" *Yan-Ling X.*, 2025 WL 3123793, at *4 (citations omitted).

The plain language of § 241.13(i)(2) does not allow a court in the first instance to make

the required individualized finding.  *Hoac*, 2025 WL 199377, at *3; *Nguyen*, 788 F. Supp. 3d at 150 (quoting *Kong v. United States*, 62 F.4th 608, 620 (1st Cir. 2023)).  Instead, if ICE claims to make this determination, the court should review that claim using the factors set forth in 8 C.F.R. § 241.13(f), which are meant to instruct ICE when making such determinations.  *Hoac*, 2025 WL 199377, at *3.  The § 241.13(f) factors include but are not limited to:

> [T]he history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

Respondents cannot demonstrate changed circumstances showing a significant likelihood that Petitioner will be removed to China.  Assessing ICE's "ongoing . . . efforts to remove [the] alien" and the "reasonably foreseeable results of those efforts," this Court cannot conclude that Petitioner's removal is reasonably foreseeable.  8 C.F.R. § 241.13(f).  Respondents argue to the contrary, explaining that ICE is taking the necessary steps to obtain travel documents.  (Doc. 22 at 2.)  Respondents explain that as of December 18, 2025, ICE submitted updated travel documents to the ICE attaché for forwarding to CNIA in response to CNIA's inability to identify the Petitioner.  (*Id.*; Doc. 22-1 at 2.)  However, in *Hoac* and *Phan*, this Court rejected a similar argument, finding that the government's "pending updated travel document request" was insufficient to show a change in circumstances.  *Hoac*, 2025 WL 1993771, at * 4; *see also Phan*, 2025 WL 1993735, at *5 ("Respondents' intent to eventually complete a travel document request for Petitioner does not constitute a changed circumstance.").

Respondents also fail to explain when the ICE attaché will forward the supporting documents to China, making it difficult to assess the probable timeline of Petitioner's removal.  (*See* Doc. 22 at 2.)  Initially, Respondents anticipated receiving Petitioner's travel document "on or shortly after December 20, 2025," but this did not occur.  (Doc. 16-1 at 3.)  As of the date of this order, Respondents are still waiting on Petitioner's travel document despite having initiated the process over three months ago, longer than the typical removal period.  (Doc. 16-1 at 2); 8

U.S.C. § 1231(a)(1)(A) ("[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days . . ."); *Yan-Ling X.*, 2025 WL 3123793, at *5 ("An undue delay in removal for an individual alien beyond the typical removal period would naturally suggest that removal is unlikely.") (citations omitted).  This is true, despite Respondents claim that the "Chinese government has recently been fulfilling travel document requests within forty-five to sixty days, but sometimes less."  (Doc. 9-1 at 4; Doc. 16-1 at 3.)

Second, the "history of the Service's efforts to remove [the] alien[] to the country in question" and "the alien's efforts to comply with the order of removal" also does not sway in Respondents favor.  8 C.F.R. § 241.13(f).  Respondents fail to explain how the supplemental documents will assist CNIA in their identification process.  (Doc. 22 at 2.).  Indeed, Petitioner represents he has never had a separate travel document from China, (Doc. 14 at 14), which may explain China's difficulty in identifying him, (*see* Doc. 22-1 at 2).  Additionally, DHS has struggled to obtain travel documents for Petitioner in the past.  When Petitioner was previously detained by ICE, his travel applications to the Chinese consulate were unsuccessful.  (Doc. 14 at 15); *Yang v. Kaiser, et al.*, No. 2:25-cv-02205-DAD-AC (HC), 2025 WL 2791778, at *4–5 (E.D. Cal. Aug. 20, 2025) (explaining that petitioner's removal is not reasonably foreseeable, in part, because petitioner "has applied for travel documents to China . . . several times since 2018 but has been unable to procure such travel authorization.").

As a result of being unable to deport him, DHS released Petitioner from ICE custody on two separate occasions, in 2011 and again in 2018.  (Doc. 9-1 at 3–4; *see also* Doc. 9-2 at 10).  Respondents failure to "provide[] [] details about why that documentation could not be obtained in the past" and failure "to show why obtaining that particular documentation is more likely [to occur] this time around" weighs in favor of Petitioner.  *Liu v. Carter*, 2025 WL 1696526, No. 25-3036-JWL, at *3 (D. Kan. June 17, 2025).  On two separate occasions, this Court has similarly found that past difficulties to obtain travel documents suggests that removal is not reasonably foreseeable.  *Hoac*, 2025 WL 1993771, at *4 (explaining that respondents' inability to remove petitioner in 2023 "due to § 1231(a)(2) concerns with travel documents" raised doubt that petitioner's removal was foreseeable); *Phan*, 2025 WL 1993735, at *5 (same).

10

Third, the "views of the Department of State regarding the prospects for removal of aliens to the country or countries in question" also weighs in favor of a finding for Petitioner.  8 C.F.R. § 241.13(f).  Respondents argue that statistics on ICE's website indicate Petitioner's removal to China is foreseeable.  (Doc. 22 at 2; Doc. 22-1 at 3.)  Respondents explain that between October 2020 and December 2024, ICE removed 1,481 aliens to China, of which 370 had criminal convictions or pending criminal charges.  (*Id*.)  Therefore, Petitioner's criminal record will not preclude DHS from obtaining a travel document to China.  (*Id*.)  Petitioner argues that these statistics are unpersuasive because according to a Letter from Congress to DHS dated July 11, 2024, "100,000 Chinese nationals with final orders of removal remain in the [United States], as Beijing has been slow or outright refused to accept the repatriation of its citizens."  (Doc. 23-2 at 2–3; *see also* Doc. 1-2 at 2.)

The Court agrees with Petitioner.  According to statistics on ICE's website, in 2024, there were 2,452 Chinese nationals in ICE detention and 517 successful removals.  U.S. DHS, *ICE Enforcement and Removal Operations Statistics*, https://www.ice.gov/statistics (last visited January 16, 2026).  Of those removed, 108 had criminal convictions or pending criminal charges.  *Id*.  Thus, in year 2024, about 21% of Chinese detainees were deported and about 4.4% of those with a criminal history were deported.  *Id*.  In 2025, there were 1,454 Chinese nationals in ICE detention and 411 successful removals.  *Id*.  Of those removed, 114 had criminal convictions or pending criminal charges.  *Id*.  This means that in 2025, about 28% of Chinese detainees were deported and about 7.8% of those with a criminal history were deported.  *Id*.  While those statistics have increased from 2024 to 2025, the percentage of Chinese nationals deported by DHS remains low, even more so for those with a criminal record.  *Id*.  Petitioner is a Chinese national with a criminal record, (Doc. 9-1 at 3–4).  Thus, based on these recent statistics from 2025, his removal to China is not significantly likely to occur within the foreseeable future.  (Doc. 22 at 2.)

As in *Phan*, this Court is also missing pertinent information, such as the "total number of requests for removal that were made to [China]" during year 2025.  *Phan*, 2025 WL 1993735, at *4 (citing *Nguyen*, 788 F. Supp. 3d at 151).  In *Nguyen*, the court reasoned that it might be able to gauge how likely it is that the petitioner would be removed to Vietnam if the court knew what

percentage of the requests Vietnam accepted.  For instance, "[i]f DHS submitted 350 requests and Vietnam issued travel documents for 328 individuals" then removal was significantly likely to occur, but "if DHS submitted 3,500 requests and only 328 individuals received travel documents" then respondents would not be able to meet their burden.  *Nguyen*, 788 F. Supp. 3d at 151.  Similarly, the Court has no evidence regarding the percentage of successful requests to China to demonstrate changed circumstances.  *Id.*; *see also Phan*, 2025 WL 1993735, at *4.

Respondents also submit two articles indicating that DHS deported various Chinese nationals on December 9, 2024, and June 3, 2025, marking a series of large-scale removal flights to China during those years to justify Petitioner's re-detention.  (Doc. 22-2 at 2, 4.)  However, courts have rejected similar evidence as insufficient.  *See Yang*, 2025 WL 2791778, at *6 (finding that respondents' citation to the same article regarding a June 2025 charter flight to China which successfully deported 122 Chinese nationals did not demonstrate changed circumstances in petitioner's *particular* case) (emphasis added); *Liu*, 2025 WL 1696526, at *1–2 (finding that "an increase in successful repatriations to . . . China in 2024" did not bear on the likelihood of obtaining travel documents for petitioner absent some evidence specific to petitioner's case).

Considering the evidence, Respondents fail to show a significant likelihood of Petitioner's removal to China.  While the government has significant discretion to enforce immigration laws, it must do so consistent with the requirements of its own regulations and the Due Process Clause.  *Diaz v. Wofford*, No. 1:25-cv-01079-JLT-EPG, 2025 WL 2581575, at *7 (E.D. Cal. Sept. 5, 2025) (citations and quotations omitted).  And where an immigration regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute and ICE fails to adhere to it, the challenged action is invalid.  *Yan-Ling X.*, 2025 WL 3123793, at *6 (citations and quotations omitted).  Here, DHS's failure to follow its own procedural regulations constitutes a due process violation.  Because ICE re-detained Petitioner without complying with 8 C.F.R. §241.13(i)(2), Petitioner is likely to succeed on his claim that his continued detention is unlawful.

b.    *Respondent's Failure to Provide Petitioner with a Pre-Deprivation Hearing Constitutes a Due Process Violation.*

Petitioner further argues that the Due Process Clause bars ICE from re-detaining him

without first providing a hearing where ICE bears the burden to show that he is a flight risk or danger. (Doc. 2 at 21–26; Doc. 23-2 at 3–4.) As a threshold matter, Respondents suggest that this Court should deny such injunctive relief because ICE is taking the necessary steps to "review Petitioner's custody" and has determined that Petitioner will remain in custody pending issuance of a travel document. (*See* Doc. 22 at 1–2.) Specifically, ICE explains that because Petitioner has not "demonstrated that, if released, [he] will not pose a risk of flight and threat to public safety," his prolonged detention is warranted. (Doc. 22-2 at 7.) Petitioner argues that this Court cannot rely on Respondents "own internal review procedures" to release him from custody and that such procedures erroneously placed the burden of proof on Petitioner rather than Respondents. (Doc. 23-2 at 3.)

To settle this dispute, the Court turns to the applicable regulations governing the detention and release of non-citizens subject to final orders of removal. *See Diaz*, 2025 WL 2581575, at *4 ("Noncitizens subject to a removal order may be released pursuant to 8 C.F.R. § 241.4 or 241.13."). 8 C.F.R. §241.4(d)(1) clearly places the burden of proof on the non-citizen detainee to show that his release will not pose a danger or flight risk. The regulation states:

> The district director, Director of the Detention and Removal Field Office, or Executive Associate Commissioner *may release an alien if the alien demonstrates* to the satisfaction of the Attorney General or her designee *that his or her release will not pose a danger to the community* or to the safety of other persons or to property *or a significant risk of flight pending such alien's removal from the United States*. The district director, Director of the Detention and Removal Field Office, or Executive Associate Commissioner may also, in accordance with the procedures and consideration of the factors set forth in this section, continue in custody any alien described in paragraphs (a) and (b)(1) of this section.

8 C.F.R. §241.4(d)(1) (emphasis added).

However, 8 C.F.R. § 241.4(b)(4) clearly states that "[t]he custody review procedures in this section *do not apply* after the Service has made a determination, pursuant to the procedures provided in 8 C.F.R. § 241.13, that there is *no significant likelihood that an alien under a final order of removal can be removed* in the reasonably foreseeable future." (emphasis added). The provision goes on to state, "However, if the Service subsequently determines, because of a change of circumstances, that there is a significant likelihood [of removal] . . . , the alien shall again be

13

subject to the custody review procedures under this section." 8 C.F.R. § 241.4(b)(4).

This provision is at play here. DHS initially determined there was no significant likelihood of removal back in April 2018 when they released petitioner on an OSUP. (*See* Doc. 9-2 at 10.) Then, DHS purports to have determined that, due to changed circumstances, there is now a significant likelihood of Petitioner's removal to China. (*See* Doc. 9-2 at 21.) Thus, consistent with 8 C.F.R. § 241.4(b)(4), Petitioner is "again [] subject to the custody review procedures under this section," which includes 8 C.F.R § 241.4(d)(1) regarding the non-citizen's burden to show their release will not pose a danger or flight risk. However, this would only be true if DHS had a legitimate basis to believe that the Petitioner's removal is presently foreseeable. As explained above, Respondents failed to make such showing. Accordingly, Petitioner is not subject to Section 241.4(d)(1)'s custody review procedures. *See* 8 C.F.R. § 241.4(b)(4). Seeing as this provision does not apply, Respondents erred in placing such burden on the Petitioner. (*See* Doc. 22-2 at 7.)

Further, many courts in this district have found that when a non-citizen subject to a final order of removal is released on OSUP and is re-detained years later, the non-citizen is entitled to a pre-deprivation hearing prior to detention due to an accrued liberty interest. *See e.g., J.L.R.P.*, 2025 WL 3190589, at *8–10; *Alva v. Kaiser*, No. 25-cv-06676-RFL, 2025 WL 2419262, at *3–5 (N.D. Cal. Aug. 21, 2025). In *J.L.R.P.*, this Court found that the petitioner was entitled to a bond hearing prior to re-detention because (1) petitioner had a significant private interest in remaining free from detention after being out of custody for nearly four years and built normal attachments to life (2) the risk of erroneous deprivation is high because 8 C.F.R. §§ 241.13 and 241.4 do not provide for review of ICE's reasons for revocation by a neutral arbitrator and (3) the government's interest in detaining petitioner without a hearing is low because in immigration court, custody hearings are routine with minimal costs. *J.L.R.P.*, 2025 WL 3190589, at *9–10 (citing the factors enumerated in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)). Similarly, in *Alva*, the court found a due process violation where the government detained a non-citizen with a final order of removal, released on OSUP for over six years, without a pre-deprivation hearing. *Alva*, 2025 WL 2419262, at *3–5.

Likewise, for nearly seven and a half years, Petitioner lived at liberty in the United States. He gained lawful employment, supported his family, volunteered for his community, and furthered his education. (Doc. 2 at 12, 19–20; Doc. 23-3 at 4–15.) He complied with his conditions of release and did not commit further criminal violations since his last order of supervision in April 2018. (Doc. 23-2 at 3.) Respondents do not dispute these assertions. (Doc. 9 at 2–3; Doc. 16 at 2; Doc. 22 at 3.) There are no changed circumstances to justify his re-detention in this regard. Accordingly, in the event of his re-detention, Petitioner has a right to a pre-deprivation hearing where the government bears the burden of showing that Petitioner's release poses a flight risk or danger to the community. *J.L.R.P.*, 2025 WL 3190589, at *9–10; *Alva*, 2025 WL 2419262, at *3–5. For these reasons, the Court finds that Petitioner is likely to succeed on the merits of his due process claim.

### 2. Irreparable Harm

As for the second *Winters* factor, it is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (citations omitted). Because Petitioner is likely to succeed on the merits of his due process claim, he has "carried [his] burden as to irreparable harm." *Id*. at 995. As the Supreme Court has recognized, incarceration "has a detrimental impact on the individual" because "it often means loss of a job" and "disrupts family life." *Barker v. Wingo*, 407 U.S. 514, 532–33 (1972). Accordingly, the Court finds that Petitioner faces irreparable harm absent injunctive relief.

### 3. The Balance of the Equities and Public Interest

Finally, the balance of the equities and the public interest tip in favor of granting injunctive relief. When the government is the nonmoving party, "the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted). As discussed above, Petitioner has a strong interest in an individualized bond hearing and immediate release so he can exercise his rights under the Constitution and have an opportunity to abate the imminent harms described above. Granting relief would not deprive the government of the opportunity to prove to a neutral decisionmaker whether Petitioner poses a threat to the community or a flight

15

risk, or whether his removal is significantly likely to occur in the foreseeable future, such that detention is necessary.

The public interest also weighs in Petitioner's favor. "The public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (citing *Jorge M.F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021)); *see also Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). All this leads the Court to conclude that Petitioner has demonstrated a due process violation regarding the applicable statutes and regulations sufficient to warrant his immediate release and a bond hearing in the event of future re-detention.

4.      Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or his conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

**IV.      CONCLUSION AND ORDER**

1.      Petitioner's Motion for Reconsideration (Doc. 14) is **GRANTED,** and the Court **GRANTS** the motion for preliminary injunction.

2.      Respondents are **ORDERED** to release Petitioner immediately under the conditions of his most recent order of supervision.

3.      Respondents are **ENJOINED** from re-detaining petitioner unless there are material changed circumstances and a neutral decisionmaker determines that there is a significant

16

likelihood of petitioner's removal in the reasonably foreseeable future, or Respondents demonstrate by clear and convincing at a pre-deprivation bond hearing before a neutral decisionmaker that Petitioner is a flight risk or danger to the community such that his physical custody is legally justified.

        4.      The matter is **REFERRED** to the assigned magistrate judge for consideration of the merits of the petition.

IT IS SO ORDERED.

Dated:   **February 3, 2026**

UNITED STATES DISTRICT JUDGE

17